On behalf of the appellant, Mr. Christopher McCoy, on behalf of the appellate, Mr. Scott Jacobson. Are both sides ready to proceed? Pardon me, you may proceed when you're ready. Good morning, Your Honor. Good morning, Counsel. May it please the Court, my name is Christopher McCoy and I represent the District Attorney and I represent the appellant, Ms. Myra Avila. Ms. Avila was convicted of intimidation. This charge stemmed from two nearly identical text messages which read, come for babies or I'm going to throw to garbage. Now this message apparently referenced the defendant's two twin babies who were supposedly fathered by the complaining witness. Of course, these babies never actually existed. In our brief, we raised three issues. Today, I'll be focusing primarily on the first issue concerning reasonable doubt. But if this Court has any questions regarding the second two ineffectiveness arguments, I'd be happy to answer those as well. Turning now to the first argument, the State failed to prove beyond a reasonable doubt that Ms. Avila committed the offense of intimidation for three reasons. First, the State failed to prove that these text messages constituted a threat. Second, they did not prove the requisite intent requirement. And third, they did not prove that Ms. Avila was actually sent these text messages. At the outset, it's important to clarify exactly what the State must show for the offense of intimidation. Basically, it boils down to two fundamental parts. First, you have the threat itself and then you have the specific act that the defendant intends the complaining witness to do or not to do as a result of the threat. And the State must prove both of these things in order for any conduct to be considered intimidation. In this case, the State failed to prove either one of these. And so even if Ms. Avila had sent these text messages, again, it's our position that she did not send these text messages and that the State did not prove she sent these. But even if she had, this conduct does not constitute intimidation. Turning now to the element of a threat. When you say it doesn't constitute intimidation, I would like to know if you're saying as a matter of law or that the evidence was insufficient to establish that had those messages been sent by her, then you would have conceded that had the evidence established that it could be intimidation. No, Your Honor. Even had she sent these text messages, as a matter of law, this would not be intimidation because of the fact that this was not a threat, because it was not reasonable for Mr. Huerta to believe these children existed. And secondly, because the State did not prove their intent requirement. So as a matter of law, when the intent requirement is not shown, the crime cannot be intimidation. Turning to the threat. Could it be disorderly conduct or something? Or is this just not a crime? Your Honor, perhaps it would be a tort of intentional infliction of emotional distress. If the State had shown different elements that proved a breach of the peace, perhaps it might be disorderly conduct. But that's not what's charged here, and that's not the evidence they put forth at trial. What about a false report to a police officer? Your Honor, first, the defendant did not make a report to the police officer. And second, I believe that part of that statute is a requirement that you're reporting a crime. I don't know if this would qualify. Well, I think it's more appropriate, I think, to say obstruction of justice in the sense that when the police officer was asked for information, she gave them information that the children existed when in fact she knew that they didn't, and therefore she was obstructing justice. Had she told them when they first inquired that the children were nonexistent, then the Oh, semi-wild feral goose chase. Your Honor, that is not the charge that we have before us. And the trial court, in finding her guilty of intimidation, didn't have to find whether or not that was true that she said this to the police. One of the officers, I believe it was a North Aurora police officer, testified that she did tell them that she had twin babies at her sister's house. However, to one of the later officers, I believe it was the West Chicago officer, she denied that she ever said this. And of course, we don't have her testimony. She never testified at trial. So this was whether or not she lied to the police was not an issue at this trial, and thus it would, what happened there with her lie isn't really relevant to intimidation because intimidation would have been over, the crime would have been complete once she sent this text message if, in fact, this constituted intimidation. My point, counsel, is that looking at this from the time that the two text messages were sent to the time that it was determined that the children didn't exist was a period of time where if this particular crime didn't occur, at least there was some criminal activity going on that would tend to indicate that this is not as inconsequential as you seem to suggest. Your Honor, I'm not trying to suggest it's not inconsequential. What I'm trying to suggest is the state did not prove the crime they charged. If the state wanted to charge her with obstructing or some kind of disorderly conduct, they could have, but that is not what they charged in this case. And the elements of that were not presented, did not have to be proven before the trial court, so we don't know what the trial court would have done if the trial court would have decided that, in fact, she did lie or would have believed Ms. Avila, her later statement, that she never told this to the police officers. And so the fact is, again, intimidation is what the state charged, that's what the trial was for, and the state did not prove their case. They did not prove this was a threat because a threat must have a reasonable tendency to create apprehension. So in this case, there must have been a, well, Mr. Huerta, the complaining witness, must have reasonably believed that Ms. Avila was going to carry out this threat. Again, this is an objective determination based on the context in which the text message was sent, and based on this context, the record makes it abundantly clear that this belief was unreasonable, this belief that these babies actually existed. Again, the complaining witness saw no proof that Ms. Avila was pregnant. His timeline for the pregnancy has the babies either conceived at a time when he and the defendant are not engaged in an intimate relationship or they're born after only a four to five month pregnancy. Also, he believes the babies were delivered on the living room floor of Ms. Avila's house and then she's back at home later that night after delivering these extremely premature twin babies. He further never sees any proof when he's staying over at Ms. Avila's house between September 2007 to December 2007. He's over there at least once a week and never sees any proof of any babies. And added to all this is their years-long on-again, off-again relationship in which the defendant three times prior has claimed that she's pregnant with the complaining witness's baby, and the complaining witness has seen zero babies as a result. The third pregnancy was specifically suspect because then, again, he believed that that baby was conceived when he and the defendant were not engaged in an intimate relationship. And when he went to the hospital, the hospital said, we don't have any record that a baby by that name was born here. So given this history, any reasonable person would be extremely skeptical of future claims by Ms. Avila that she was pregnant. And given the outlandish facts in this fourth pregnancy, it's unreasonable for him to believe these babies existed. And thus, this text message did not constitute a threat. Secondly... Do you agree that the language used regarding throwing babies in the garbage meets the physical harm requirement of the statute? Well, Your Honor, the state also really hasn't proven what throwing in garbage means. I mean, again, the text says, come for babies or I'm going to throw to garbage. Whether this is just temporarily placing the babies in the garbage or simply leaving them exposed, that is a question that would be up to the trial court. And certainly, there could be proof that throwing to the garbage would be sufficient physical harm, putting a baby in a dumpster. But again, this belief that this threat will be acted out must be reasonable. And in this case, it is not reasonable to believe that she's going to act this out because there's no babies and it's not reasonable for Mr. Huerta to believe that babies exist. Therefore, just based on this, the conduct charged here does not fall within the parameters of intimidation. Also, the state failed to prove the intent requirement in this case. As charged, the state was required to prove that Ms. Avila sent these text messages with the specific intent to coerce the complaining witness into picking up his children. Again, the children don't exist. This was an impossible act. There was no way she could have intended him to pick up children that don't exist. And thus, the state has failed to prove the specific intent. And based on this alone, this charge cannot stand and this conviction cannot stand. Moreover, well, in its brief, the state argues to the contrary that all they need to prove in terms of intimidation is just to show that the text messages were sent with the intent to make the complaining witness generally act against his will. However, this argument has been specifically rejected by the court in Havering. And it's helpful to sort of understand some of the facts of Havering to really understand this holding. In that case, a victim came into her bedroom, found two armed men robbing her. She turned on a light switch, which was right next to a home security alarm that would have called the police. Initially, she did not activate the security alarm. She just turned on the light switch. The defendant in Havering pointed a gun at her and said, turn that off. Now, he was convicted of intimidation for saying that threat with the intent to coerce the victim into not calling the police. He argued on appeal that this intent requirement was not proven. The state argued instead that the type of act the defendant intended is not an element of intimidation, or alternatively that any act would suffice. However, the Havering court rejected these two arguments by the state. And it further held that it will reverse the conviction for the defendant, holding that there's no proof that he said this threat with the intent to coerce the victim into not calling the police. Now, from the facts of that case, he obviously pointed a gun at someone and said, turn that off. He's intending to coerce the victim to do something against her will, but it's just not what was charged in the indictment. And that's the same thing we have in this case, and that's why the state's argument in its brief must be rejected here as well. In fact, in all the intimidation cases, or at least all the intimidation cases I've found in my research, the court has specifically found a specific act that the defendant intended the complaining witness to do or not to do as a result of the threat. So you don't think telling him to come here and pick the kids up is the result that the threat was issued for? Well, it cannot be picking the kids up because the children don't exist. So simply telling him, pick them up, how could she intend him to do this when she knows very well these children never existed? Well, if you told me that you had children, but you didn't, and if I then took a gun, put it up to your head and said, give me all your money or I'll kill your children, according to you, that would not be either a robbery or intimidation because since you don't have any children, I couldn't carry out the threat. Your Honor, it would not be intimidation because the threat in that case would not be possible. Perhaps if the state charged that the – let me back up for a second. I think it's important to distinguish impossible acts between the threat and the act that the defendant wants the complaining witness to do or not to do. In your example, the threat is to kill the children. Now, if someone just said to me, and I had no children, I'm going to kill your children or give me all your money, I would say you're not getting my money. There's nothing you can do. It's not intimidation because the victim knows that the children don't exist, whereas the criminal perpetrator doesn't. That's exactly the opposite of what happened here where the defendant knew she didn't have any children, but the victim didn't. So you're telling me that these two cases are identical? Your Honor, they're not identical. You suggested that in your case it was impossible to have intimidation because the children didn't exist, and I then showed you a situation where you flipped the people who have knowledge and you said that because the children don't exist, it's impossible, which means that the only other possible permutation is we both don't know they exist. And then I held a gun up to your head and said, do you know if you have children? And if you said, I don't know, and then I said, well, if you don't know, then I don't know, but if you did know, I would kill your children if, in fact, you had any. That might be an act of intimidation. Your Honor, there's a difference between not knowing and actually affirmatively knowing that they don't exist. The defendant, again, there's a difference between the threat and the intended result. If the defendant, in your example, came up to me and said, give me all your money, knowing full well I have no money, the defendant could not intend for that to be intimidation. Now, knowing if the threat exists and knowing if that's impossible is a separate question as to knowing whether the specific intent and this action that the defendant wants the complaining witness to take is impossible because, again, intimidation is a specific intent crime. So the defendant, in your example, again, knowing that I had no money, could not intend for me to give him money as a result of the threat. Your example is focusing on impossibility as a result, as it concerns the threatened action, killing the children. What we're focusing on is not killing the children but picking up the children, and those are two separate inquiries. Because it's a specific intent, the defendant must know that it's, well, the defendant cannot know that it's impossible in order for her to intend this as a result of her threat. If she knows it's impossible, then why is she making the threat? And the fact is, no one can give an explanation why. The trial court can't, the citizen state's attorney can't, and the state interpreter can never give an explanation why she sent this text message. Again, the key to intimidation is there's some result you want. There's something you want the complaining witness to do, and because of that, you issue a threat. And that is simply not here in this case, and it cannot be picking up the children. It's not the paternity suit because, frankly, there's no logical connection between those two. It's not mentioned in the text message or charged in the indictment, and telling him to come pick up his children is not going to in any way get him to drop the paternity suit when he finds out these children don't exist. And therefore, the state, in its case, has not proven intimidation. Setting all this aside for the reasons stated in our brief, even if this conduct could constitute intimidation, the state still hasn't proved that it was Miss Avila who actually sent these text messages, as they cannot point to a specific phone number where these text messages came from. If there's any other questions on this issue or the other issue, we would ask this court to reverse Miss Avila's conviction for intimidation, or in the alternative, due to ineffective assistance of counsel, remand this case for a new trial. Thank you. Counsel? Good morning, Your Honors. Good morning. May it please the Court, Counsel. It seems that in this case, the defense would like to have it both ways. They would like to only talk about the crime of intimidation itself, but not talk about the history and the relationship between these parties. They would like to talk about the idea that it was unreasonable for the victim to believe that these children existed, but then would like to talk about what the circumstances were and the relationship between the victim and the defendant. This is a case of intimidation by manipulation, and I will submit to you that it is an unusual case, but it's certainly one that falls within the statute. Now, whether or not this might also be a case of intentional infliction of emotional distress or disorderly conduct has nothing to do with whether or not this is a clear-cut case of intimidation. Here, there was a threatened act, and there was an intended act. Justice Pullman, you asked before whether or not placing children in the garbage would be tantamount to a physical harm. The defense seemed to say that no, that would not be tantamount to a physical harm because one would have to specify the duration or the period of time or whether or not placing children in a garbage can on a cold January evening would constitute a physical harm to them. I would submit that under the common-sense standard, placing children in a garbage can necessarily connotes a physical harm to them. So that element of the statute is certainly satisfied. Next, the idea of the defense seems to be that in this case, the state should have done more evidence of intent, more evidence of a threat, more evidence that this was a specific intent crime, more evidence that would be making the case less circumstantial. All of this overlooks the fact that the impossibility of consummation is not a defense to the charge of intimidation. No case holds that in the state of Illinois, and no case has ever held that in the state of Illinois since the criminal code was drafted in 1961. But while the defense might attempt to graft this requirement onto the statute, here they attempt to deny what they do not want to admit rather than admit what they can't deny. In this case, the statement made by the defendant was clear and unambiguous. There was a threat, and there was a harm attached to it. Come pick up the children before I'm going to throw them into the garbage. It doesn't get any clearer than that. Now, the defense cited one case, Hebron, and in the brief they also spoke of another case, Veracruci. In those two cases, in Hebron, as defense counsel laid out, during the course of a home invasion, a man points a gun at a woman and says, turn the light switch off. Now, he never indicates what the consequence would be of not turning off the light switch. In Veracruci, there's a gentleman having an argument with a person that he doesn't realize is an undercover police officer, and he says, the undercover police officer is inside a truck, and he says, come on out and we'll get it on right here. But there's never any statement of consequence, as there is in this case. In this case, it's very clear. Come for the children, or they're going to be thrown in the garbage. There's a statement. There's an if-then statement. If you do not come for the children, they're going in the garbage. I mean, we can all speculate as to why the defense, or as to why Ms. Avila might have sent these text messages, or what her motivations were. But for the defense to say that it wasn't, whether or not it was reasonable or not, isn't the issue. What matters is that in the context of this case, she reasonably believed that her text messages, that her communication with the victim, would have an impact on him. Now, whether or not he's, I mean, I would submit to you that he's the perfect victim in this case. Mr. Sir, did you say it's in, that your position is that she would have had to have known at the time she sends the text that it would have the desired effect on him? Yes. That's at least what the Peterson case says. Peterson says that one of the main factors to consider in the context of the relationship between the victim and the defendant is whether or not the message that's communicated, what the impact of the message would be. Has he ever come around when she's made such statements in the past? I, I, I think, Your Honor, that would, that would graft onto the intimidation statute the requirement that there be a prior threat. Didn't she ask him when she gave birth in the living room to come down, and he said he couldn't because he was in Wisconsin or something like that, and then he came down later on? I, I believe, I believe that's true, Your Honor. Yes. I know, I know that he came down later that day. I mean, again, the timeline is a little hazy on that aspect. He does come down later that day. I also, I believe he attempts to go to the hospital in Arlington Heights and that he's told he encounters the, the unknown boyfriend who tells him that he's not going to get to see the children. Is it, what is, isn't the standard of behavior whether or not a rational prior effect defying the elements of the offense beyond a reasonable doubt? That's my understanding of the standard of behavior, Your Honor. Oh. Am I to assume that the judge was not rational? Or am I to assume that the underlying facts are not rational? Or am I to assume that we're not rational? What is it that is wrong, if you can tell me? Sure. What is the position that you think that the defense is making relative to whether or not a rational prior effect could not have possibly beyond a reasonable doubt found that this was proven to be a prior effect? Well, I think the defense's main argument, I think, is that this is largely a circumstantial case and that, you know, the sending of the text messages might not have necessarily directed the victim to come from Wisconsin down to Illinois. I think that would be it. I think their position is that the facts found by the trial court and that the trial court found that she did send the text messages and that she did have the specific intent to intimidate him. I think their argument is that that was unreasonable. Was the fact that the victim came down to the state of Illinois and talked to at least, I think, two police departments indicative of whether or not he came down based upon the threat? I think you're stealing my thunder, Judge. Yes, I do think that it is, I do think that it indicates that he took the threat seriously. I also think, I mean, to me, one of the most important facts in this case is that after the North Aurora Police Department shows up at her house, she then leads them on this, for lack of a better term, snipe hunt out to West Chicago, to her sister's house, and then only there tells the police that, in fact, the two children never existed. And the police officers also speak to her sons, and they ask them, you know, where, what bedroom in the house do your sisters live in? And they point them to the back bedroom of the house in North Aurora. I mean, she's got her kids, she's got her kids at least in the position that they're willing to tell the police that their sisters live in that house. Did we ever determine whether the children actually believe that the child, the children lived in the back bedroom, or did we find from the record that the children were coached into... That was never explored. It never developed beyond that point. But, I mean, to me, that's a pretty telling fact. Like I said, I think the defense wants to get into what the motive was behind this, you know, whether she had the victim who, I mean, I would submit that he was pretty... Was it reasonable for this victim to believe that statement? I think in the context of this relationship... With babies. What do you mean? How could these possibly be his babies? How could they possibly be his? Well, I mean, the month before the text messages start, he goes into a law office and the attorney that he hired testifies at trial. No, let's go back a few more months. Okay. They start having a relationship in April and the babies are born in August. Sure. I think he does kind of vacillate between March and April, but... Okay, I'll give you the benefit of the doubt. Thank you very much. It's still very, very premature. I agree. How is it reasonable for him to believe this? What if she had said, I'm going to send them to the mom? Okay. I would submit to you that this was a victim without guile. I'm not saying that he... I'm sorry, without... Without guile. Without much, yeah. Sure. But all that aside, I mean, you know, it's well settled that you take the victim as you find them. And if you look at the context of this relationship... But isn't that still sort of, but reasonably? Oh, I mean, you know, she has the first pregnancy. She goes out to California. She tells him that that baby died. She buried the baby in California. And then on the one-year anniversary of that child's death and every year thereafter, she calls the victim and tells him, pray for the death of his child. She moves back to Illinois. They eventually pick up again. She supposedly gets pregnant. They go to the abortion clinic together. They abort, which she later tells him were twins. She then tells him every year following that abortion to pray for the death of their two children. I mean, and they have this on-again, off-again relationship. What keeps two people together? I have no idea. Regardless. Yeah. But then when she has two children, he doesn't see them. He doesn't see any evidence of them. At some point, don't we have some reasonable yardstick to place here? I don't – I truly don't know. I thought the record indicated that she showed photographs of the babies. She did send – he did show pictures of sonograms that he had received in his cell phone. Now, I don't recall specifically when those were sent. I believe they were in relationship to the most recent pregnancy of the twins. I don't know enough about sonograms to tell you whether or not they actually showed twins or whatever. I'm sure the victim didn't know. But regardless, I mean, Your Honor, Justice Jorgensen, with respect, I think everything in the context of this relationship was designed to manipulate this man into believing that he had two twin daughters on the way. And then not only that, but they're given names, Samantha and Sophia. I mean, sure, he comes to the defendant's house every week. You know, he – I can't imagine what those conversations are like. I truly have no idea. But the point is, I mean, if we look back to the unreasonable witness testimony cases like People v. Cunningham, for example, you know, there are certain unreasonable facts out there. But the point is whether or not the trial court errs in relying upon witness testimony is, to me, under the Collins standard, I think the most compelling issue in this case. That all being said, to answer Justice McLaren's concern, I don't think any fact found by the trial court was unreasonable, given the context of the relationship in this case. I think that everything the defendant did was designed to manipulate this victim. Whether he's guileless or whatever other word we want to attach to it, the point is, is that this is a case of intimidation by manipulation. And that culminated in this text message where you have a clearly intended act, come here and see the children, and the threatened act of physical harm, or I'm going to throw the children in the garbage. I mean, to me, nothing speaks more clearly to the act of intimidation than the text message itself. So all that being said, I think the statutory requirements are clearly satisfied. I think the defendant is attempting to either subsume the impossibility defense under the statute, or at the very least argue that circumstantial evidence is insufficient. As we both know, I'm sorry, as we all know, those are two propositions of law that simply do not hold water. So all that being said, the state would submit the defendant's conviction to stand, and that no further action is required. The defendant raised the question of, or the issue that the state failed to prove beyond a reasonable doubt that she in fact sent the text. What is the foundation for admission of a text? What is the foundation for admission of a text? I mean, you would purport that you met it, so what was it that you met? What we met was we showed, we introduced the victim's cell phone, which had the, it had two separate text messages, one which had a signature attached to it. I'm not sure if it was like a preprogrammed signature on the defendant's cell phone. Just said her name, right? Just said her name, yeah. And then there's another text message which uses her nickname, which is Poncha. I think the Poncha text message comes in about a minute before the Myra A text message comes in. So I would, I think that they were two different text messages sent from, sent from either, from two different phones. I believe the record is a little bit ambiguous as to when, I'm sorry, as to what numbers they were sent from, but it does get clarified through the complainant's testimony that he does have two different numbers saved in his phone for her. Did you say that they, that you believe the texts were sent from two different phones? I believe so, yes. Or two different numbers? Well, two, I'm sorry, two, well, again, I'm not sure. I know that, I know that at least, well, you know what, actually, I take that back. I mean, with, I'm just thinking with my own personal experience with cell phones, you could save a number. Yeah, but that's outside the record. Sure. What was presented here for the foundation? I'm sorry, what was presented here was that there were two different text messages that were identical in content but had different, that came from different addresses, at least how it appeared in the defendant's or in the victim's address book. So one came from Poncha and the other came from Myra A. And the Myra A one had a Myra signature attached to it. So I don't know if that indicates that it came from a different phone or not, or that, for example, the phone that sent that text message had a signature attached to it. I'm not sure. What I do know is that it's certainly possible to save the same number twice in a phone and receive the same text message twice, even though you're only using the same number. I believe the only two phone numbers that were ever attributed to the defendant were a cell phone number and a home phone number. So your position is that those foundational requirements are satisfied if a text appears on phone A and it correlates to a number from phone B? Correct. Regardless of whether there's a second text message there. So if I were to take your phone and send a threat to someone, you might be charged with intimidation. You don't have to show who sent the message? I think you're using presumption. No, I don't think it's a presumption, but I think given the facts in this case, it's not unreasonable. But I mean, not whether it's reasonable or not. I'm asking what exactly is the foundational requirement? Because counsel raised that the State did not prove beyond a reasonable doubt that she sent it. Not that her phone generated a text, but that she was the one who operated the phone in order to send it. I'm just trying to question it. No, no, I understand. I don't know that that's so much a foundational requirement. I think the element of foundation is satisfied by showing that it came from her phone. Whether or not the bonafideness of whether she's the person that sent the text message. Circumstantial evidence? I think that's, yeah. I believe that falls under any circumstantial evidence. Thank you very much. Thank you. Counsel, do you wish to reply? Yes. Your Honors, the State is trying to compress the two fundamental parts of intimidation into one. Again, there are two key elements. There's the threat, which in this case was throwing the children to the garbage. And then there was the intent, which was the intended act, and this was pick up children. Now, both of these cannot – did not prove intimidation. First, the threat was not reasonable. For all the reasons laid out in our brief, it was unreasonable for anyone to believe that these babies actually existed after all the reasons given to believe that they don't exist. And the evidence of what happened after the text messages sent and during the extended testimony from police officers about searching the defendant's house, that's not relevant to the context in which the text messages were sent because the crime has already been committed. All this stuff is just after the fact. Furthermore, Justice McLaren mentioned the cell phone photographs of the babies. This is insufficient evidence when mounted against all of the other reasons to believe that these babies didn't exist. What we have is two grainy cell phone photographs of what looks to be babies. But anyone could take pictures of babies on their cell phone or download pictures of babies from the Internet. This doesn't prove that Miss Avila actually gave birth to these children. And the second part of intimidation is the intended act. Now, counsel can never say what act the defendant intended the complaining witness to perform. We're not trying to subsume the impossibility defense. It's just a logical argument. If Miss Avila knew, which she did know, that these babies did not exist, there's no way she could intend for Mr. Huerta to pick them up. A person cannot intend for someone else to do something they very well know that person, it's impossible for them to do. And for this reason, the intent element has further not been met. Now, I admit this is a bit confusing at first blush when applying this framework to the facts of this case, but that's the point. The state's trying to fit a square peg into a round hole, and they're trying to make a case for intimidation where one certainly just doesn't exist. And finally, getting to the argument that the state did not prove that Miss Avila actually sent the text messages, again, there's no direct proof in this case. It all revolves around circumstantial evidence, but this circumstantial evidence is suspect. As counsel said, he in his argument could not say what phone number or even how many phones sent these two text messages. I mean, that is a reasonable doubt to believe whether or not Miss Avila was the one who sent it. And furthermore, the complaining witness had motive to send these text messages to himself or to get someone else to send these text messages to himself. As evidenced by the paternity suit, he wanted custody of these babies. He wanted to be part of their lives. And perhaps he thought he could use this text message as in some way to benefit him in that paternity suit. Now, he wouldn't have had to take the extreme measures mentioned by trial counsel of using some sort of computer hacking program. Instead, all that would be required was to just have someone send him these text messages and then assign whatever phone number that is the contact name Poncha or Myra A. And the fact that the state can't specifically say what phone number these come from shows that this phone, these text messages could have come from any phone number. And they can't even connect the phone numbers that they bring up at trial. In trial, three state witnesses testified at five different phone numbers from the defendant. And there's no clarification which one actually sent these text messages. The state's attorney trial never clarifies and never reconciles these three witnesses' testimony. And so the complaining witness could have easily had someone sent him this text message and just assigned it that name. And there's other reasons to believe Ms. Avila didn't send it. First of all, two text messages are sent when the complaining witness clearly testifies at trial that she only ever sends him one text message at a time. And the second one just adds the name Myra. The state can never give an explanation why she would send these two text messages or why she would add this extra word to the second one. And there's finally the poor spelling and grammar. Mr. Huerta said that he preferred texting in Spanish. Well, Ms. Avila worked for ten years as a receptionist at a doctor's office and completed half of her nursing degree, of course, before this felony conviction. But even still, that prior education and prior employment shows that she needed some command, some mastery of the English language, which is just not evident by these two text messages. And thus the state's circumstantial evidence does not amount to proof beyond a reasonable doubt. And for these reasons, we again ask this court to reverse Ms. Avila's conviction or an alternative, again due to ineffective assistance of counsel, to remain this case for a new trial. Thank you. Thank you.